_____
                                  )
FERRING PHARMACEUTICALS INC.,     )
                                  )
        Plaintiff/                )
        Counterclaim-Defendant,   )
                                  )
        v.                        )          Civil Action No.
                                  )          13-12553-NMG
BRAINTREE LABORATORIES, INC.,     )
                                  )
        Defendant/                )
        Counterclaim-Plaintiff.   )
_____  )

### MEMORANDUM & ORDER

**GORTON, J.**

This case arises out of a dispute between pharmaceutical companies that promote and offer for sale competing bowel preparation drugs that are administered prior to colonoscopies. Plaintiff/counterclaim-defendant Ferring Pharmaceuticals Inc. ("Ferring"), a Delaware corporation based in Switzerland, promotes and offers for sale a treatment under the name Prepopik. Defendant/counterclaim-plaintiff Braintree Laboratories, Inc. ("Braintree"), a Massachusetts corporation with a principal place of business in Braintree, Massachusetts, promotes and offers for sale a treatment under the name Suprep.

Both parties allege that the other has engaged in false advertising in violation of the Lanham Act and unfair business practices in violation of M.G.L. ch. 93A. Ferring also alleges

that Braintree has diluted its trademark in Prepopik by suggesting that it poses the same risks as a chemically-identical product promoted for sale in Canada, Pico-Salax. Braintree counterclaims for misappropriation of trade secrets based upon Ferring's possession of certain Braintree training documents related to Prepopik and Suprep.

Pending before the Court are Ferring's motion to dismiss Braintree's Amended Counterclaim and Braintree's motions for leave to file a Second Amended Counterclaim and for summary judgment on all claims asserted by Ferring.

## I.  __Procedural History__

Ferring filed its Complaint against Braintree in October, 2013.  Braintree answered, filed a Counterclaim and moved for expedited limited discovery.  Ferring moved to dismiss the Counterclaim for failure to state a claim in December, 2013 and Braintree thereafter filed an Amended Counterclaim in lieu of opposing the motion to dismiss.  Shortly thereafter, Ferring moved to dismiss the Amended Counterclaim and Magistrate Judge Bowler denied the motion for expedited limited discovery for lack of good cause shown.

In May, 2014, Braintree moved for summary judgment on all claims in the Complaint and for leave to file a Second Amended Counterclaim that would supplement its allegations and add two

new counts under New Jersey Consumer Fraud Act.  The Court heard oral argument on the pending motions on July 14, 2014.

## II. __Ferring's Motion to Dismiss Braintree's Amended Counterclaim__

Braintree's three-count Amended Counterclaim alleges 1) misappropriation of trade secrets and confidential information, 2) false advertising in violation of § 43(a) of the Lanham Act and 3) unfair and deceptive trade practices in violation of M.G.L. c. 93A.  Ferring moves to dismiss for failure to state a claim upon which relief can be granted.

### A. __Legal Standard__

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In considering the merits of a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Langadinos v. Am. Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000).  Yet "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice to state a cause of action. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Accordingly, a complaint does not state a claim for relief where

the well-pled facts fail to warrant an inference of anything more than the mere possibility of misconduct. Id. at 679.

**B.    Count I: Misappropriation of Trade Secrets**

### 1.    Relevant Background

In June, 2013, Howard Dorfman ("Dorfman"), the Vice President and General Counsel of Ferring, contacted Braintree to express his concerns about certain Braintree training materials that he had come to possess.  Dorfman told Braintree that the subject materials were "sent in from the field" by an unknown source and denied that they had been provided to Ferring by a former Braintree employee.  Ferring has returned the six pages of training materials to Braintree and denies possessing additional pages.  Nevertheless, Braintree believes that Ferring possesses the full scope of its training materials because it is unaware of any plan to disseminate only the six pages that Ferring returned to Braintree.  It asserts that Ferring has misappropriated an undisclosed number of pages of Braining training materials and the trade secrets contained therein.

### 2.    Legal Standard

A trade secret is

> any formula, pattern, device or compilation of
> information which is used in one's business, and which
> [provides] an opportunity to obtain an advantage over
> competitors who do not know or use it.

Burten v. Milton Bradley Co., 763 F.2d 461, 463 (1st Cir. 1985).

On the other hand, "[m]atters of public knowledge or general

knowledge in an industry" are not trade secrets. J.T. Healy &

Son, Inc. v. James A. Murphy & Son, Inc., 260 N.E.2d 723, 729

(Mass. 1970) (quoting Restatement of Torts § 757 cmt. b).

Courts consider several factors when determining whether

particular information qualifies as a trade secret, including:

> 1) the extent to which the information is known
> outside of the business; 2) the extent to which it is
> known by employees and others involved in the
> business; 3) the extent of measures taken by the
> employer to guard the secrecy of the information; 4)
> the value of the information to the employer and to
> his competitors; 5) the amount of effort or money
> expended by the employer in developing the
> information; and 6) the ease or difficulty with which
> the information could be properly acquired or
> duplicated by others.

Jet Spray Cooler, Inc. v. Crampton, 282 N.E.2d 921, 925 (Mass.

1972). Ultimately, whether information qualifies as a trade

secret "depends on the conduct of the parties and the nature of

the information." Id.

To prevail on a claim of misappropriation of trade secrets,

a party must show: 1) the existence of a trade secret, 2) that

it took reasonable steps to preserve secrecy, and 3) that the

other party "use[d] improper means in breach of a confidential

relationship" to acquire the secret. Data Gen. Corp. v. Grumman

Sys. Support Corp., 36 F.3d 1147, 1165 (1st Cir. 1994),

abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick,

-5-

559 U.S. 154, 159-60 & n.2 (2010).  The party asserting the claim must identify with adequate specificity the trade secret or proprietary information that was allegedly misappropriated by the defendant. See Sutra, Inc. v. Iceland Express, EHF, No. 04-11360-DPW, 2008 WL 2705580, at *3-4 (D. Mass. July 10, 2008) (explaining that it is "hornbook law" that a plaintiff must identify the trade secret at issue with adequate specificity).

### 3. Analysis

Based upon that standard, Braintree has failed to state a claim for misappropriation of trade secrets.  Its claim based upon its entire set of training materials cannot proceed because it has not identified with adequate specificity any trade secrets in materials that have not been submitted with the pleadings. See Sutra, 2008 WL 2705580, at *3-4; cf. Aware, Inc. v. Centillium Comm'c'ns, Inc., 604 F. Supp. 2d 306, 313 (D. Mass. 2009) (denying motion for more definite statement of misappropriation because the parties had exchanged materials and therefore knew which materials the other possessed).

Moreover, the pages which Ferring has admitted to possessing do not contain protectable trade secrets.  The six pages include publicly available information about Prepopik such as its ingredients and recommended dosage.  Information within the public domain is not a trade secret. J.T. Healy & Son, 260 N.E.2d at 729.

The documents also include information about <u>Ferring</u>'s marketing strategy.  For instance, a set of Powerpoint slides entitled "Prepopik Battle Plan" discloses where Ferring will focus its marketing efforts, the number of doctors each Ferring representative will target, and the steps Ferring took to market Prepopik before its official launch.  Braintree cannot plausibly claim that information it has obtained about the marketing strategy <u>of a competitor</u> is a protectable trade secret. <u>Cf.</u> <u>Banner Indus.</u> v. <u>Bilodeau</u>, No. 3-236-C, 2003 WL 831974, at *3-4 (Mass. Super. Ct. Feb. 27, 2003) (explaining that information that a company learned from other manufacturers and distributors was not "confidential" under Massachusetts law).

Braintree asserts that information its own marketing strategy means that the documents are a protected "compilation" of propriety information. <u>Burten</u>, 763 F.2d at 463.  It is true that the materials recommend marketing strategies for Suprep in light of the marketing strategy for Prepopik.  For instance, they state that Suprep is more effective, less expensive and safer for patients with low renal function than Prepopik ("SUPREP does not sacrifice efficacy for volume"), urge sales representatives to emphasize the link between Prepopik and the Canadian drug Pico-Salax ("Don't hide from the fact that Pico is out there and discuss this with accounts") and suggest

leveraging existing relationships ("BLI has been servicing these accounts for over 3 decades, don't be fooled by a foreigner!").

While at least one court in this District has suggested that marketing strategies may be protectable trade secrets under Massachusetts law, see Diomed, Inc. v. Vascular Solutions, Inc., 417 F. Supp. 2d 137, 144-45 (D. Mass. 2006), Braintree offers no evidence that the information about differences in price, efficacy and safety is proprietary to Braintree.  Furthermore, it is implausible that platitudes such as "Cash in on relationships!" are the product of significant effort or investment or are valuable to Braintree's competitors. See Jet Spray, 282 N.E.2d at 925.  In sum, while the materials contain some information about Braintree's marketing strategy, that information is not protected by Massachusetts law.

### C.   Count II: False Advertising (Lanham Act)

Braintree alleges that Ferring has violated the Lanham Act by making four false or misleading claims about Prepopik related to: "superior cleansing efficacy", "lowest volume", "flexible dosing" and "helps achieve success".

### 1.   Legal Standard

Braintree's claim arises under Section 43(a)(1)(B) of the Lanham Act.  A party violates that provision by

> us[ing] in commerce [on or in connection with any
> goods or services] any word, term, name, symbol, or
> device, or any combination thereof, or any false

-8-

> designation of origin, false or misleading description
> of fact, or false or misleading representation of fact
> which ... in commercial advertising or promotion,
> misrepresents the nature, characteristics, qualities,
> or geographic origin of his or her or another's
> goods, services, or commercial activities....

15 U.S.C. § 1125(a)(1)(B).  To prevail on a claim brought under

that statute, a plaintiff must prove the following elements:

> (1) [the defendant] made a false or misleading
> description of fact or representation of fact in a
> commercial advertisement about [its] own or another's
> product; (2) the misrepresentation is material, in that
> it is likely to influence the purchasing decision; (3)
> the misrepresentation actually deceives or has the
> tendency to deceive a substantial segment of its
> audience; (4) [the defendant] placed the false or
> misleading statement in interstate commerce; and (5) [the
> plaintiff] has been or is likely to be injured as a
> result of the misrepresentation, either by direct
> diversion of sales or by a lessening of goodwill
> associated with its products.

Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d

302, 310-11 (1st Cir. 2002), cert. denied, 537 U.S. 1001 (2002).

A plaintiff can satisfy the first element by proving either

that the subject advertisement is "false on its face", i.e.

"literally false", or that it is "literally true or ambiguous

but likely to mislead and confuse consumers." Clorox Co. P.R.  v.

Proctor & Gamble Commercial Co., 228 F.3d 24, 33 (1st Cir. 2000)

(citations omitted).  While mere "exaggerated advertising,

blustering and boasting upon which no reasonable buyer would

rely" is not actionable, "specific and measurable claims of

product superiority" are not puffery and may be literally false under the Lanham Act. Id. at 38-39 (citations omitted).

Whether an advertisement is literally false is a question of fact. Id. at 34. A fact-finder must determine 1) what claim is conveyed by the advertisement and 2) whether that claim is false. Id. The challenged statement should be viewed in the context of the advertisement as a whole. Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc., 653 F.3d 241, 253 (3d Cir. 2011) (citations omitted). Furthermore, "only an unambiguous message can be literally false." Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 587 (3d Cir. 2002). Thus, an advertisement that relies upon the consumer or viewer to "integrate its components and draw the apparent conclusion" is less likely to be found literally false. Id. The sophistication of the viewing audience is relevant to the question of whether a claim is misleading but not whether it is literally false. Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 465, 476 (D.N.J. 2009).

As a result, claims of literal falsity will generally survive a motion to dismiss. As another court in this District has explained,

> [u]nless the complained of speech is such that a court can properly say that no reasonable person could be misled by the advertisement in question, it is not appropriate to resolve the issue of the truthfulness of the speech on a motion to dismiss.

*Genzyme Corp.* v. *Shire Human Genetic Therapies, Inc.*, 906 F. Supp. 2d 9, 17 (D. Mass. 2012) (internal citations, alteration and quotation marks omitted).

Finally, while Ferring identifies several District of New Jersey cases in which courts applied a heightened pleading standard to Lanham Act claims, no First Circuit authority supports applying such a heightened standard. Absent such authority, this Court will follow others in this District in declining to apply a heightened pleading standard to Lanham Act claims. *See* *McGrath & Co., LLC* v. *PCM Consulting, Inc.*, No. 11-10930-DJC, 2012 WL 503629, at *7 n.1 (D. Mass. Feb. 15, 2012).

### 2. Application

#### a. "Superior Cleansing Efficacy"

The "superior cleansing efficacy" claim is pled in the Amended Complaint as follows:

> In or about October 2013, contrary to the existing head-to-head study [comparing Prepopik to Suprep] and other reports, Ferring falsely advertised in Gastroenterology & Endoscopy News a "superior cleansing efficacy ... with the lowest volume of active prep solution." These superiority claims are unsubstantiated, false and misleading, and they overstate efficacy and superiority to competitor products including those of Braintree.

The subject advertisement in Gastroenterology & Endoscopy News is referenced in the Amended Counterclaim and therefore is part of the Fed. R. Civ. P. 12(b)(6) record. *See* Clorox, 228

-11-

F.3d at 32 (1st Cir. 2000). An asterisk next to the claim of "superior cleansing efficacy" directs the reader to a paragraph of fine print that explains that the claim is based on "demonstrated non-inferiority" during randomized trials.

Braintree asserts that the claim of "superior cleansing efficacy" is a false and misleading claim of superiority because it overstates the efficacy of Prepopik relative to competing products. In particular, Braintree maintains that the advertisement is false because it ignores the results of a "peer-reviewed head-to-head comparison" of Suprep and Prepopik that was released in July, 2013. Such allegations state a claim of literal falsity under the Lanham Act. A claim to "superior cleansing efficacy", backed up by study results, is not mere "puffery" upon which no reasonable physician or consumer would rely but is instead a verifiable claim that Prepopik is superior to competing products. See Clorox, 228 F.3d at 38-39 (explaining that the claim "Compare with your detergent ... Whiter is not possible" is not non-actionable puffery because it is a specific, measurable claim that could be proven true or false).

### b. "Lowest Volume"

The "lowest volume" claim is pled as follows:

> In the same and other promotional materials, including a Ferring piece titled "Prepopik: The lowest volume of active prep solution," Ferring has repeatedly made representations that Prepopik uses the "lowest volume of active prep solution," which is also false and

misleading because there are tablet-only prep products
requiring no solution.

The parties have identified at least two versions of the
"lowest volume" claim.  First, the advertisement inside the
October, 2013 issue of Gastroenterology & Endoscopy News states
that Prepopik provides "superior cleansing efficacy ... with the
lowest volume of active prep solution" (emphasis added).  A
second advertisement that appears on the front cover of the same
publication states "experience the lowest volume of active prep
ingredient ... for your patients" (emphasis added) and directs
viewers to the full Prepopik advertisement within the
publication.  Along with the copy, both advertisements depict
images of a cup, an orange slice and a box labeled "Prepopik."

Braintree contends that such statements are literally false
because there are tablet-only bowel preparation products that
require no solution at all.  Ferring responds that a reasonable
physician who viewed the advertisement would be aware of the
different kinds of colon preparation regimens and would
understand that the "lowest volume" claim did not refer to
tablet-only preparations and instead compared Prepopik to other
products that required some amount of liquid.

Although the Court doubts that any reasonable physician or
gastrointestinal specialist viewing the subject advertisements
would find the "lowest volume" claim to be false or misleading,

it is not the role of the Court to resolve issues of truthfulness at the motion to dismiss stage. <u>Genzyme</u>, 906 F. Supp. 2d at 17.  Braintree has properly pled that the "lowest volume" claim is literally false and therefore that portion of the Lanham Act claim will survive the motion to dismiss.

### c.  "Flexible Dosing"

With respect to the "flexible dosing" claim, Braintree pleads that

> Ferring's representation that Prepopik offers "flexible dosing," such as in its piece titled "Helps achieve success ... with the lowest volume of active prep solution," is also false and misleading as patients must take certain identified doses, must drink certain requisite quantities of other liquids, and must finish drinking all requisite liquids at least two hours before their colonoscopy.

Braintree appears to be referring to the advertisement in the October, 2013 issue of <u>Gastroenterology & Endoscopy News</u> that promises "Superior cleansing efficacy ... with the lowest volume of active prep solution."  The advertisement states that "Prepopik helps patients arrive ready with ... FLEXIBLE DOSING using either a split dose or day-before regimen."  Ferring asserts that "flexible dosing" is not false or misleading because it does not mean that there are no restrictions on when and how Prepopik is administered.

The Court agrees.  The "flexible dosing" claim, unlike the claims of superior cleansing efficacy and lowest volume, does

not draw an implicit comparison between Prepopik or assert a specific and measureable benefit that can be proven true or false. See Clorox, 228 F.3d at 38-39. At most, the term "flexible" is ambiguous, and no reasonable person reading the advertisement as a whole would fail to understand that, as used in context, "flexible dosing" refers to "either a split dose or day-before regimen". See Pernod, 653 F.3d at 253; Novartis, 290 F.3d at 587.

### d. "Helps Achieve Success"

Finally, Braintree pleads that Ferring has made a "helps achieve success claim":

> In addition, another Ferring publication titled, "Helps achieve success ... with the lowest volume of active prep solution," contains Ferring's representation that Prepopik "helps achieve success" over competitors, which is an overstatement of efficacy contrary to head-to-head findings.

At no point has Braintree identified a specific advertisement or other publication that includes the claim "helps achieve success," even when expressly invited to do so by the Court at the hearing on the pending motions. Furthermore, the Court credits Ferring's good faith effort to identify the source of the statement. Even under the minimal pleading standards of Fed. R. Civ. P. 8, more is required to survive a motion to dismiss. Furthermore, even if the Court accepted as true the assertion that Ferring has claimed that Prepopik "helps achieve

success," that generic claim is at most puffery and is not actionable under the Lanham Act.

### D.   Count III: Violation of M.G.L. ch. 93A

Finally, because Ferring takes the position that Counts II and III rise and fall together, the motion to dismiss Count III is denied.

### III. Braintree's Motion for Leave to File Second Amended Counterclaim

Braintree claims that it learned after filing its Amended Counterclaim that representatives of Ferring have distributed an "Addendum" to the Prepopik Patient Instruction Sheet that recommends taking Prepopik in conjunction with other drugs to maximize its efficacy.  It asserts that the Addendum is disseminated as part of a marketing campaign coordinated by Richard Rice, the National Sales Director for Prepopik, out of the Ferring headquarters in New Jersey.

Based upon that newly acquired information, Braintree seeks leave to file a Second Amended Complaint that 1) pleads factual information about the "Addendum" in support of its claim that Ferring has made false statements about the minimal dosage volume and efficacy of Prepopik, 2) asserts a claim under the New Jersey Consumer Fraud Act and 3) asserts a claim of common law unfair competition.

**A.  Legal Standard**

Pursuant to Fed. R. Civ. P. 15(a), a party may amend its complaint once as a matter of course either before the other party files a responsive pleading or 21 days thereafter. Fed. R. Civ. P. 15(a)(1).  All other amendments require the opposing party's written consent or leave of court. Fed. R. Civ. P. 15(a)(2).  The court "should freely give leave when justice so requires." Id.  Although Rule 15 has been construed liberally, amendment is not warranted if it would be futile or reward undue or intended delay. See Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994).  An amendment is "futile" if the claim, as amended, would fail to state a claim upon which relief may be granted. Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996).  Accordingly, the Court will apply the same standard of legal sufficiency as it would apply to a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Id.

**B.  Analysis**

**1.  Amendment to Existing Allegations**

Ferring's counsel explained at oral argument that Braintree had refused to provide a copy of the so-called "Addendum" and that he was unaware of any such statement or publication.  He suspects that the instructions to take Prepopik alongside other drugs were added by a doctor before Braintree came to possess the document.  The Court will not resolve that factual dispute

-17-

at this stage and will permit Braintree to supplement its claims

under the Lanham Act and Chapter 93A with new information.  It

cautions Braintree, however, that it will impose sanctions if it

finds that Braintree's intent in seeking leave to add the

information about the "Addendum" was to harass its opponent and

increase the settlement value of this litigation.

### 2.    Count IV: New Jersey Consumer Fraud Act

Ferring contends that the proposed amendment is futile

because it fails to state a claim under the New Jersey Consumer

Fraud Act ("NJCFA").

### a.    Legal Standard

In order to state a prima facie claim under the NJCFA, a

plaintiff must demonstrate

> (1) unlawful conduct by the defendant; (2) an
> ascertainable loss by the plaintiff; and (3) a causal
> connection between the defendant's unlawful conduct
> and the plaintiff's ascertainable loss.

Mickens v. Ford Motor Co., 900 F. Supp. 2d 427, 436 (D.N.J.

2012) (quoting Payan v. GreenPoint Mortg. Funding, 681 F. Supp.

2d 564, 572 (D.N.J. 2010)).  "Unlawful conduct" is defined as

> [t]he act, use or employment by any person of any
> unconscionable commercial practice, deception, fraud,
> false pretense, false promise, misrepresentation, or
> the knowing, concealment, suppression, or omission, in
> connection with the sale or advertisement of any
> merchandise....

N.J. Stat. Ann. § 56:8-2.  Where, as here, a party is alleged to

have engaged in an "affirmative" unlawful act rather than an

-18-

omission, the party asserting a claim under the NJCFA need not prove that the other party intended to act unlawfully. <u>Mickens</u>, 900 F. Supp. 2d at 436 (citations omitted).

The parties dispute whether claims arising under the NJCFA are subject to the heightened pleading standards of Fed. R. Civ. P. 9(b). They disagree in particular about how the Court should interpret the statement in <u>Mickens</u> that Fed. R. Civ. P. 9(b)

> imposes a heightened pleading requirement for allegations of fraud, including [NJ]CFA claims, over and above that required by Rule 8(a).

<u>Id.</u> at 435 (quoting Hughes v. <u>Panasonic Consumer Elecs. Co.</u>, No. 10-846, 2011 WL 2976839, at *10 (D.N.J. July 21, 2011). Ferring argues that <u>Mickens</u> and other cases establish that any claim arising under the NJFCA must satisfy Rule 9(b). Braintree contends that the statement is dicta and suggests that other precedent indicates that the heightened standard applies only to alleged omissions and not "affirmative" unlawful acts.

That position is unsupported by the case law. Numerous courts have stated that a heightened pleading standard applies to NJCFA claims and have not distinguished between affirmative acts and omissions. <u>See</u> <u>Donnelly</u> v. <u>Option One Mortg. Corp.</u>, No. 11-7019, 2014 WL 1266209, at *6 (D.N.J. Mar. 26, 2014) (citing <u>Parker</u> v. <u>Howmedica Osteonics Corp.</u>, No. 07-2400, 2008 WL 141628, at *2 (D.N.J. Jan. 14, 2008)). Courts have also applied the heightened pleading standard to NJCFA claims alleging that

-19-

the defendants made false statements in advertising, which is an affirmative act. <u>See, e.g.</u>, <u>Hoffman</u> v. <u>Natural Factors Nutritional Prods. Inc.</u>, No. 12-7244, 2014 WL 2916452, at *3 (D.N.J. June 26, 2014) (applying Rule 9(b) to alleged false claim that product "promoted mental focus"); <u>Smajlaj</u> v. <u>Campbell Soup Co.</u>, 782 F. Supp. 2d 84, 98 n.9 (D.N.J. 2011) (acknowledging that "[s]ome claims under the CFA may not require pleadings complying with Rule 9(b)" but explaining that, at the very least, the heightened pleading requirements apply to affirmative misrepresentations).

### b. Analysis

Fed. R. Civ. P. 9(b) requires a party asserting a claim of fraud to state "the circumstances constituting the fraud or mistake ... with particularity."  A party satisfies that heightened standard by

> plead[ing] or alleg[ing] the date, time, and place of the alleged fraud or otherwise inject[ing] precision or some measure of substantiation into a fraud allegation.

<u>Frederico</u> v. <u>Home Depot</u>, 507 F.3d 188, 200 (3d Cir. 2007). Furthermore, the party alleging fraud must describe "who made the misrepresentation to whom" and the "general content" of the alleged misrepresentation. <u>Lum</u> v. <u>Bank of Am.</u>, 361 F.3d 217, 224 (3d Cir. 2004) (internal citations omitted).

Braintree's conclusory allegations fail to satisfy that burden.  While the Proposed Second Amended Counterclaim identifies an alleged misrepresentation (the so-called "Addendum" that recommends taking Prepopik along with other drugs notwithstanding claims of product superiority and low-volume administration) and a potential source of that misrepresentation (Rick Rice, the National Sales Director for Prepopik), it fails to substantiate the assertion that

> [u]pon information and belief, Ferring disseminated this "Addendum" widely to patients and potential prescribers of both Braintree's and Ferring's products nationwide.

That statement does not substantiate when, where or to whom any misrepresentation was made and therefore does not satisfy Fed. R. Civ. P. 9(b).  See Hoffman, 2014 WL 2916452, at *4.

### 3.   Count V: New Jersey Common Law of Unfair Competition

Ferring contends that Braintree's Proposed Second Amended Counterclaim fails to state a claim of common law unfair competition arising under Massachusetts law.  Notwithstanding the fact that the Proposed Second Amended Counterclaim is silent as to the source of the common law, Braintree responds that Ferring's arguments about Massachusetts law are misplaced because it intends to assert a claim under New Jersey law.

Regardless of the source of the law, the new facts alleged by Braintree do not give rise to a claim of unfair competition

-21-

under New Jersey common law.  While courts have recognized that the concept of "unfair competition" under New Jersey common law is "as flexible and elastic as the evolving commercial standards of commercial morality demand," it is "not boundless." Wellness Publ'g v. Barefoot, No. 02-3773, 2008 WL 108889, at *19-20 (D.N.J. Jan. 9, 2008) (quoting Duffy v. Charles Schwab & Co., 123 F. Supp. 2d 802, 815 (D.N.J. 2000)).  Instead, New Jersey courts have recognized that, in most cases, unfair competition consists of the "misappropriation" of another's property through "palming off" another's goods as your own or by unfairly imitating another's goods or services. Id. at *20.  Based upon that precedent, at least one federal district court has held that false advertising is not actionable under New Jersey common law. Id. at *20-21.  The Court agrees with that assessment and finds that the proposed Second Amended Counterclaim fails to state a claim under New Jersey common law of unfair competition.

## IV.  **Braintree's Motion for Summary Judgment**

Ferring brings a three-count Complaint alleging 1) false advertising under § 43(a) of the Lanham Act, 2) unfair and deceptive trade practices under M.G.L. ch. 93A and 3) trademark dilution under M.G.L. ch. 110H, § 13.  It claims that Braintree has engaged in a concerted nationwide marketing campaign to disparage Prepopik since it came onto the market in 2012 in order to cause healthcare professionals to prescribe Suprep over

-22-

Prepopik.  Specifically, it suggests that Braintree has made
false and misleading statements in its marketing materials about
the risks associated with Prepopik and the efficacy of Suprep
and that it has thereby diluted Ferring's trademark in Prepopik.

Braintree moves for summary judgment on those claims and
contends that discovery is unnecessary because Ferring could not
obtain any information during discovery that would entitle it to
judgment in its favor.

### A.    Legal Standard

The role of summary judgment is "to pierce the pleadings
and to assess the proof in order to see whether there is a
genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d
816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc.,
895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving
party to show, through the pleadings, discovery and affidavits,
"that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the
suit under the governing law." Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant
or unnecessary will not be counted." Id.  A genuine issue of
material fact exists where the evidence with respect to the

material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). The non-moving party may not, however, rest merely upon "conclusory allegations, improbable inferences and unsupported speculation." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000).

### B. Application

#### 1. Lanham Act Claim (Count I)

##### a. Risks of Using Prepopik

Braintree moves for summary judgment on the claim that it violates the Lanham Act by falsely claiming that Prepopik is "dangerous" or "deadly".

###### i. Relevant Background

In 2012, Ferring issued a press release to announce that the United States Food and Drug Administration ("FDA") had approved Prepopik for colonoscopy preparation. The press release stated that

-24-

> Ferring has a long history in the international
> gastroenterology market, where PREPOPIK is available
> in Canada (marketed under the name PICO-SALAX), U.K.,
> and other countries ....

Prepopik and Pico-Salax are chemically identical but are different in other respects. First, Prepopik is approved in the United States only for cleansing of the colon as a preparation for colonoscopies performed on adults. In contrast, Pico-Salax is approved in Canada for the additional uses of preparing for x-ray examinations and surgeries and is also approved for pediatric use. Second, the dosing instructions for Prepopik require users to consume about 2.19 liters over the course of two doses whereas Pico-Salax requires a total of 3 to 4 liters to be consumed over the course of the two doses. Different amounts of liquid can change the risks associated with fluid and electrolyte imbalances. Third, Pico-Salax is available over the counter in Canada whereas Prepopik must be prescribed in the United States.

In January, 2013, an agency of the Canadian government published information about Pico-Salax in Canadian Adverse Reaction Newsletter, Vol. 23, Issue 1 ("the Canadian Newsletter"). The Canadian Newsletter stated, inter alia, that

> The diarrhea produced by [Pico-Salax] can lead to
> dehydration and loss of electrolytes, particularly
> sodium which may result in hyponatremia and
> convulsions.... As of June 30, 2012, Health Canada
> received 11 reports of convulsions suspected of being
> associated with Pico-Salax.

Ferring alleges Braintree is "using the Canadian Newsletter and related oral statements to falsely promote that the Prepopik drug is unsafe" (the "Canadian Newsletter Safety Claim"). It also alleges that it obtained an annotated copy of the Canadian Newsletter at a physician's officer on which a Braintree sales representative had written "Prepopik = Pico-Salax."

At oral argument, counsel for Ferring admitted that Pico-Salax and Prepopik are owned by different subsidiaries within the same "international group" of companies.

## ii. **Analysis**

Braintree contends that it cannot be liable for stating that Prepopik is dangerous or deadly because the Canadian Newsletter establishes that Pico-Salax is dangerous and its alleged statements that "Prepopik = Pico-Salax" are also true according to Ferring's admissions in its press release and the fact that the drugs are chemical equivalents. See Cashmere & Camel Hair, 284 F.3d at 310-11.

The Court disagrees and finds that genuine issues of material fact preclude summary judgment. First, the Canadian Newsletter does not definitively establish that Pico-Salax is dangerous. At this point, there are disputed issues of fact concerning what conclusions should be drawn from the information provided therein. Second, the Canadian Newsletter explained

that losing electrolytes creates a risk of convulsions and therefore there is a genuine dispute as to whether the different dosage instructions for Prepopik eliminate that risk.  In sum, the Court cannot conclude, based solely on the allegations in the Complaint, that claims that Prepopik is "dangerous" or "deadly" are non-actionable because they are true.

### b.    Efficacy of Suprep

Braintree also contends that it is entitled to summary judgment on Ferring's claim that Braintree makes false or misleading claims about the efficacy and superiority of Suprep.

### i.    Relevant Background

Braintree's marketing materials include a "comparison detailer" entitled "What's Not New About Prepopik" ("the Comparison Detailer") that states that Suprep is 98% effective whereas Prepopik is only 74% effective.  Ferring claims that there are no head-to-head studies comparing the two products. Ferring also states that its own clinical trials showed that Prepopik is more than 74% effective.

In an advertisement published in the September, 2012 edition of Clinical Gastroenterology and Hepatology, Volume 10, Number 9, Braintree stated that the Suprep Bowel Prep Kit "achieved 'excellent' bowel cleansing in patients based on investigator grading" and "significantly more patients had 'excellent' preps" when they used the Suprep Bowel Prep Kit

instead of a polyethylene glycol bowel prep drug ("the Suprep Clean Freak Advertisement").

According to Ferring, the prescribing information and FDA approval documents for Suprep indicate that there are no statistically or clinically significant differences between the Suprep Bowel Prep Kit and a control group treated with polyethylene glycol.

### ii.  Analysis

The parties dispute whether Ferring can carry its burden of proving that those statements are false and misleading.

Ferring claims that such statements are "establishment claims."  Establishment claims are advertisements that represent "explicitly or implicitly ... that tests or studies prove [a] product superior." Gillette Co. v. Norelco Consumer Prods. Co., 946 F. Supp. 115, 121 (D. Mass. 1996) (quoting Castrol, Inc. v. Quaker State Corp., 977 F.2d 57, 63 (2d Cir. 1992)).  A plaintiff satisfies its burden of showing that an establishment claim is false or misleading under the Lanham Act by

> showing that the tests did not establish the proposition for which they were cited [which it may do by] demonstrating that the tests were not sufficiently reliable to permit a conclusion that the product was superior.

Id. (quoting Castrol, 977 F.2d at 63).

In contrast, Braintree asserts that the challenged claims are "non-establishment claims."  A non-establishment claim is a

"general claim of superiority." Id.  To prove the falsity of a non-establishment claim, a plaintiff must "affirmatively prove defendant's product equal or inferior" to another product. Id. (quoting Castrol, 977 F.2d at 63).

Ferring is correct that the Comparison Detailer and Suprep Clean Freak Advertisement are establishment claims.  While the claims do not expressly reference a study or test, claims of 98% effectiveness and superior results "based on investigator grading" are not "general claims of superiority." Id. at 121. As a result, to prevail on its Lanham Act claim, Ferring must demonstrate that the head-to-head study on which the claims of superiority purportedly rely "is not sufficiently reliable to permit a conclusion" that Suprep is superior. Id. (quoting Castrol, 977 F.2d at 63).

The existence of genuine disputes of fact with respect to the reliability of the head-to-head study preclude summary judgment in favor of Braintree.  For instance, the study abstract alone does not establish reliability and the Court and Ferring have not been provided with the full results. Similarly, it is unclear from the existing record whether the study was in fact peer-reviewed as Braintree claims.

## 2.  Chapter 93A Claim (Count II)

Chapter 93A proscribes those engaged in trade or commerce from employing "unfair methods of competition and unfair or

deceptive acts or practices" and authorizes businesses to sue one another for engaging in such practices. M.G.L. ch. 93A, §§ 2, 11.  Whether a particular set of circumstances is unfair or deceptive is a question of fact. Incase, Inc. v. Timex Corp., 421 F. Supp. 2d 226, 239 (D. Mass. 2006).  In the context of disputes among businesses, where both parties are sophisticated commercial players, the

> objectionable conduct must attain a level of rascality
> that would raise an eyebrow of someone inured to the
> rough and tumble of the world of commerce.

Levings v. Forbes & Wallace, Inc., 396 N.E.2d 149, 153 (Mass. App. Ct. 1979).

Braintree maintains that there is no evidence that it acted in bad faith or with the requisite "rascality" because it simply reported true and accurate scientific information based upon the results of the head-to-head study and Ferring's own admissions about the identity between Prepopik and Pico-Salax.  Given the existence of genuine issues of material fact concerning the reliability of the head-to-head study or the conclusions one may draw from the Canadian Newsletter, Braintree is not entitled to a finding that it did not behave with sufficient "rascality" as a matter of law at this stage of the proceedings.

### 3.    Trademark Dilution Claim (Count III)

In its Complaint, Ferring states that, on October 3, 2013, it registered "Prepopik" pursuant to M.G.L. ch. 110H and owns

the trademark in Prepopik as Massachusetts Registration No. 78049.  It contends that the Prepopik trademark is a "strong and distinctive trademark" and that the use of the trademark in the Comparison Detailer and the annotations on the Canadian Newsletter creates at least a likelihood of dilution of its distinctive quality.  Braintree moves for summary judgment on the grounds that Ferring cannot prevail as a matter of law.

### a.    Legal Standard

M.G.L. ch. 110H entitles a holder of a mark registered pursuant to that chapter to obtain injunctive relief due to a

> [l]ikelihood of injury to business reputation or of dilution of the distinctive quality of [the] mark ... notwithstanding ... the absence of confusion as to the source of goods or services.

M.G.L. ch. 110H, § 13.  To prove trademark dilution pursuant to § 13, a plaintiff must show 1) that its mark is distinctive and 2) the use by the defendant of a similar mark creates a "likelihood of dilution." Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1209 (1st Cir. 1983) (citing Pignons S.A. de Mecanique v. Polaroid Corp., 657 F.2d 482, 493-94 (1st Cir. 1981)).

### b.    Application

Braintree argues that its statements that Prepopik and Pico-Salax are the same are non-actionable because both marks are owned by Ferring.  See, e.g., Universal Commc'n Sys., Inc. v.

-31-

Lycos, Inc., 478 F.3d 413, 423 (1st Cir. 2007) (citing L.L.
Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26, 31 (1st Cir.
1987) ("Trademark injury arises from an improper association
between the mark and products or services marketed by others."
(emphasis added)).

While Braintree is correct that no Massachusetts case has
expressly held that Ferring may assert a trademark dilution
claim based upon confusion between two of its own marks, it is
also the case that no court applying Massachusetts law has
foreclosed that theory. Universal Communications Systems, Inc.,
478 F.3d at 423, does not squarely address the issue of whether
one's mark can be diluted by an association with another of
one's marks. Instead, it stated that trademark injury arises
from an association with the "products or services marketed by
others" while explaining why criticism on a website did not give
rise to a trademark dilution claim under Florida law. Id. The
Court declines to attribute precedential weight to what is
clearly dicta and finds that Massachusetts law does not preclude
Ferring from asserting a claim based on confusion between two
marks that are owned by the same international conglomerate of
which Ferring is a subsidiary.

## ORDER

For the foregoing reasons,

1)     Ferring's motion to dismiss Braintree's Amended Counterclaim (Docket No. 36) is, with respect to Count I and the claims of "flexible dosing," and "helps achieve success" in Count II, **ALLOWED,** but is, with respect to Count III and the claims of "superior cleansing efficacy" and "lowest volume" in Count II, **DENIED;**

2)     Braintree's motion for summary judgment (Docket No. 62) is **DENIED WITHOUT PREJUDICE** to renewal at the close of discovery; and

3)     Braintree's motion for leave to file a second amended counterclaim (Docket No. 66) is **ALLOWED,** to the extent that Braintree may submit a Second Amended Counterclaim that includes paragraphs 40 through 42 of its Proposed Second Amended Counterclaim, but is otherwise **DENIED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated August 4, 2014