# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

FERRING PHARMACEUTICALS INC.,

Plaintiff and Counterclaim-Defendant,

v.

BRAINTREE LABORATORIES, INC.,

Defendant and Counterclaim-Plaintiff

Civil Action No. 13-cv-12553-NMG

## MEMORANDUM IN SUPPORT OF BRAINTREE LABORATORIES, INC.'S MOTION TO COMPEL RESPONSES TO DISCOVERY REQUESTS

Defendant and counterclaim-plaintiff Braintree Laboratories, Inc. ("Braintree") respectfully submits this memorandum in support of its motion to compel plaintiff and counterclaim-defendant Ferring Pharmaceuticals Inc. ("Ferring"), pursuant to Rules 33(a), 34(a) and 37 of the Federal Rules of Civil Procedure and Local Rules 34.1 and 37.1, to produce documents and respond to document requests in the expected manner.

## PRELIMINARY STATEMENT

After extensive meet and confer efforts over several months, including a letter, three telephone calls and numerous emails, Ferring has not participated satisfactorily in the discovery process. The District Judge has ruled there would be no further extensions of discovery, which makes the following conduct by Ferring particular problematic and prejudicial to Braintree:

- The failure to have produced any emails *more than a year* after the service of document requests calling for them.
- Responding to every document request merely by stating that it may produce "representative" documents subject to relevance and other boilerplate objections without disclosing what categories (or "representatives" of categories) of documents Ferring is and is not actually going to produce, if any, at some point in the future.

- The failure to include most of its pertinent sales representatives as custodians for its "Technology Assisted Review," in a case entirely about sales practices (and in which it has relied on affidavits by salespeople to defer summary judgment).
- Raising objections to document requests and interrogatories on the ground that a confidentiality order is required before responding, and failing to amend those responses in the *five months* since the Confidentiality Order entered.
- Limiting its disclosure of protocol for its use of "predictive coding."
- The failure to respond in writing at all to a detailed letter in early July 2015 raising fundamental problems with Ferring's discovery responses, objections and lack of a meaningful production.
- Breaking a promise made during meet and confer efforts in early August to amend written responses and produce emails by the day after Labor Day.

Since early July 2015, the parties have made efforts to resolve the dispute over Ferring's fundamental deficiencies. On July 6, 2015, Braintree sent a letter detailing positions on deficiencies in Ferring's responses. The parties have since spoken by telephone three times, each time attempting to address deficiencies in Ferring's discovery responses.[1] Ferring has never responded in writing to the detailed deficiencies, instead making a promise to amend written responses by the day after Labor Day, which it has failed to do. Under Local Rule 37.1, Ferring's non-responsiveness, broken commitments, and lack of transparency permit an "automatic allowance of th[is] motion." L.R. 37.1(a).

Braintree respectfully requests an Order requiring the following:

1. Ferring shall provide amended written discovery responses limiting objections to claims of privilege and without limitations based on its subjective "relevance" determinations and without limiting the production to its subjective view of "representative" documents. Anything that is withheld categorically shall be specified for each request in detail making clear why such a category of documents that are sought through the request are not being produced;

2. Ferring shall search for documents in the possession of all salespeople involved in the sale of Prepopik, not just select managers and home office personnel;

3. Ferring shall produce forthwith all responsive emails that it has already identified;

---

[1] Ferring is scheduled to discuss with Braintree, on September 16, 2015, the issues Ferring raised in its premature motion to compel (Docket Entry 128.) Unlike Ferring, Braintree has produced a

4.      To mitigate the effects of Ferring's undisclosed methods for seeding predictive-coding protocol, Ferring shall promptly provide search analytics including hit reports for all search terms Braintree suggests against the universe of electronic materials that include but is not limited to mailboxes of pertinent Ferring salespeople, and then the parties shall confer in good faith to modify such terms if necessary to avoid an unduly burdensome manual review of hits; and

5.      Ferring shall produce responsive documents concerning Braintree's marketing and business information in its possession (other than items produced by Braintree during discovery in this case), Ferring's recruitment and hiring of Braintree's former employees, and Ferring's off-label marketing practices.

## BACKGROUND

This case is about marketing and sales practices. At issue are competing products for bowel cleansing prior to colonoscopies. Braintree sells a product known as "Suprep." While Suprep was well-established in the market, Ferring introduced a competing product, "Prepopik." Ferring sells the same drug in Canada under the name Pico-Salax and in other countries under various names. Ferring's application for approval of Prepopik by the FDA expressly equated Prepopik to Pico-Salax as the same chemical substance previously approved in Canada.

In reaction to Prepopik's failure in the market after its introduction in the United States – including the fact that Suprep sells at a rate approximately five times higher than Prepopik – Braintree's positions is that Ferring has engaged in false advertising and other deceptive and unfair business practices. The claims and counterclaims concern sales and promotional activities with respect to the pertinent products. In particular, Braintree asserts:

- Since in or about 2012, Ferring has made various false statements about the purported superiority of Prepopik and denied the existence of a head-to-head study between Suprep and Prepopik, which found Braintree's Suprep product materially more effective than Prepopik
- Prepopik is not superior to Suprep, as reflected in a study and Ferring's off-label recommendations to use other laxatives along with Prepopik
- Yet Ferring has repeatedly made false and misleading representations of superiority and that Prepopik uses the "lowest volume of active prep solution"

- Ferring claims here that its product is not the same as the chemically equivalent product Pico-Salax it sells in Canada, contrary to statements by Ferring to the FDA

(Docket Entry ("Doc.") 32, Counterclaim at ¶¶ 31-39.)

Because Suprep and Prepopik are prescription products, each company's sales staff markets to medical professionals. Not only are marketing and advertising materials discoverable, but practices of and statements by the front line sales force are central to the dispute.

**Discovery Timeline and Extensive Meet and Confer Efforts**

More than a year ago, on August 22, 2014, Braintree served on Ferring interrogatories and document requests. (Declaration of Barry S. Pollack, Esq. ("Pollack Decl.") ¶ 2.) Ferring responded on or about October 24, 2014, raising various boilerplate objections. (*Id.* ¶ 3.) On March 31, 2015, Braintree served a second set of document requests. (*Id.* ¶ 4.) On May 8, 2015, Ferring responded, similarly raising various boilerplate objections. (*Id.* ¶ 5.)

On April 6, 2015, this Court entered a Confidentiality Order to facilitate the mutual exchange of documents, which had not yet begun. (*Id.* ¶ 6.) Since the entry of the Confidentiality Order in April 2015, Braintree repeatedly asked Ferring to make the mutual exchange of documents that had been pending since October of 2014. (*Id.* ¶ 7.) On several occasions, Ferring asked for more time, allowed that time to elapse without production and, on occasion, Ferring ignored Braintree's request for the mutual exchange. (*Id.*) On one occasion, Ferring blamed further delays on a death at an outside vendor. On other occasions, Ferring's excuses were not as clear. (*Id.*)

On June 11, 2015, before a single document had been produced, and with Ferring repeatedly delaying the start of productions using various excuses, Ferring sent two letters to Braintree complaining about its written responses. (*Id.* ¶ 8.) Braintree responded on June 30,

2015 with a written substantive response to both letters. (*Id.*) On July 6, 2015, Braintree wrote Ferring objecting to Ferring's continuing delays in exchanging email collections and other document production, and identifying fundamental issues with Ferring's written responses (*Id.* ¶ 9.) A key preliminary issue that Braintree raised involved Ferring's use of boilerplate objections for virtually all responses, and making its responses "subject to and without waiving" those objections without indicating what was being withheld and what, if anything, would be produced. (Pollack Decl. Ex. 5.) Braintree also raised issues with Ferring's additional disclaimer that it would produce only those documents that Ferring unilaterally deemed "representative of and relevant to the claims and defenses in this litigation," without any clear indication of what was being produced and what was being withheld. *(Id.)* Braintree also raised certain issues about Ferring's refusal to respond to certain requests at all. To date, Ferring has never responded in writing or otherwise substantively to that letter. (*Id.* ¶ 9.)

On Saturday, July 11, 2015, after months of delay, Ferring finally made an initial wave of documents available. (*Id.* ¶ 10.) Ferring's initial production conspicuously contained no emails. (*Id.*) On July 30. 2015, Ferring produced a second wave of documents. (*Id.* ¶ 12.) Incredibly, Ferring still produced no emails. (*Id.*) To date, more than a year after the original due date, Ferring has still produced no emails. (*Id.* ¶ 34.)

Simultaneously with its second production, Ferring filed a motion to compel, alleging incredibly that Braintree was delaying the discovery process and refusing to cooperate. (Doc. 128.) As previously outlined in its emergency motion for an extension of time to respond to the motion to compel, Ferring did so without first having met and conferred as required under L.R. 37.1, and despite written efforts and telephone calls from Braintree asking for the mutual meet and confer. (Doc. 134.) Ferring rejected dates that Braintree made its counsel available for a

meet and confer, at least one time merely waiting until the proposed date passed. Ferring's tactic was clear: it filed its motion to divert attention from its discovery deficiencies.

After this Court granted Braintree's emergency motion, Ferring finally engaged in a series of meet-and-confer calls on August 5 and 6, 2015. (Pollack Decl. ¶ 14). During these calls, Ferring committed to supplement some of its responses to make clear what it was and was not agreeing to produce, and to remove the objections based on confidentiality in light of the confidentiality order that had been in place. (*Id.* ¶ 16.) Ferring requested until right after Labor Day, September 8, 2015, to do so. (*Id.*) That date has passed without amended responses.

During the same August 5 and 6 calls, Braintree also learned that Ferring's search for documents did not include searching for documents in the possession of most its front line sales force (except for a small number of sales staff whom Ferring selectively chose), but instead limited its search to managers and home office personnel. (*Id.* ¶ 18.) Ferring also disclosed that it had not done *any* keyword searches, but instead had used "predictive coding" to look for what it considered to be relevant documents. (*Id.* ¶ 20.) Braintree objected to this "black box" process, given that Ferring had never disclosed the seed set or other basic aspects of its predictive-coding protocol, which also did not even include the use of mailboxes of salespeople. (*See Id.* ¶¶ 19-21.) 19.) While Ferring has disclosed the name of the software it has used and quantities of files it input into the software, as recently as September 10, 2015, Ferring confirmed again that it would not share the source, or "seed" documents that it initially inputted into its predictive coding protocol that formed the foundation of the software's application. (*Id.* ¶ 31.) Braintree lacks sufficient information as to what Ferring deemed responsive and non-responsive for purposes of educating its predictive-coding protocol.

During the meet-and-confer calls, Braintree proposed that Ferring run certain keyword searches against its universe of materials electronically designated as non-responsive in the predictive-coding processes, so as to address the risks of error in Ferring's secret predictive-coding protocol. (*Id.* ¶¶ 22 and 31.) Braintree promptly sent Ferring a list of search terms on August 13, 2015. (*Id.*) As of September 10, 2015, Ferring refused to share the results. (*Id.* ¶ 29.) In a final meet and confer effort on September 11, 2015, Ferring disclosed the analytics only for the hits of the proposed terms against the salespeople's mailboxes that were not originally searched. (*Id.* ¶ 30.) The disclosure revealed about 1,000 hits, significant but not extraordinary, for each of a few other laxatives (Miralax, Dulcolax, Linzess, and Bisacodyl) that doctors and Ferring salespeople appear to recommend that patients use to improve the performance of Prepopik. (*Id.*) The need for off-label supplements with Prepopik relates to several claims and defenses in this case, including but not limited to the merits of superiority claims at the heart of this action.

Ferring's counsel confirmed that its production to date has included <u>no</u> emails, so the glaring deficiency is not a technological error. Ferring's counsel has still not committed to a date by which to make a production of emails, let alone a substantially complete one. (*Id.* ¶ 34.) Ferring's counsel has stated it will not provide the "seed" documents that were used to generate its predictive-coding protocol. And Ferring has failed to amend its discovery responses by September 8, 2015 as promised to remove boilerplate objections, limitations to documents that Ferring unilaterally deems "relevant" and "representative," and objections based on confidentiality (now that a confidentiality order has been in place for more than five months). (*Id.* ¶ 33.)

As a result of Ferring's methodologies, Braintree has not yet received a single responsive email, even though more than a year has passed. A need to take depositions and discovery deadlines loom on the near horizon, making a resolution of the issues in this motion critical.

## DISCUSSION

I.     **Ferring's Boilerplate Objections That Conceal What it Will Produce Or Withhold Should Be Stricken, and it Should Be Required to Limit Objections to Claims of Privilege, Without Limitations Based on Either Subjective "Relevance" Positions or Subjective Views of "Representative" Documents.**

In responding to Braintree's document requests, Ferring recited a litany of general boilerplate objections that it claims "form a response to each and every Request." In addition, *nearly all* of Ferring's responses also object on the basis that the request is "overly broad and unduly burdensome" either because the requests seeks "all" documents in a category, or simply as a matter of routine. Ferring agreed to produce documents only subject to these boilerplate objections and without a description of how the objection applied to each particular request. Each Response is made "[w]ithout waiving these objections or the above General Objections." While invoking its boilerplate objections, Ferring's individual responses never reveal what it is, and is not, agreeing to produce. Ferring further limited its production to only documents it subjectively deemed "representative of and relevant to the claims and defenses in this litigation," or "representative, relevant, responsive [and] non-privileged." (*See* Pollack Decl. Exs. 1 and 3.)

"Federal courts have routinely held that boilerplate objections are improper." *Kristensen v. Credit Payment Servs.*, 2014 U.S. Dist. LEXIS 165489 at *12 (D. Nev. Nov. 24, 2014) (citing *St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 512 (N.D. Iowa 2000) (collecting cases and sanctioning a lawyer for using boilerplate objections in response to requests for production of documents)). "[B]oilerplate objections or blanket refusals inserted into a

response to a Rule 34 request for production of document are insufficient to assert a privilege." *Burlington N. & Santa Fe Ry. Co. v. U.S. District Court for the Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005). General objections that do not relate to any particular discovery request, unaccompanied by request-specific statements as to what a party is agreeing to produce, are clearly designed to obfuscate because it is impossible to determine which objections are being relied upon with respect to any particular discovery request. *See Barb v. Brown's Buick, Inc.*, 2010 WL 446638 at *1 (E.D. Va. Feb. 2, 2012).

Similarly, "[o]bjections stating that a request is 'vague', 'overly broad', or 'unduly burdensome' are meaningless standing alone." *Martin v. Zale Delaware, Inc.,* 2008 U.S. Dist. LEXIS 105215 at *3 (M.D. Fla. Dec. 15, 2008). "A party objecting on these grounds must explain its reasoning in a specific and particularized way." *Id.* Further, "just by indicating that the presence of the word 'all' is within the request does not automatically make a request overly broad, burdensome, or oppressive." *Arthrex, Inc. v. Parcus Med.*, LLC, 2012 U.S. Dist. LEXIS 156873 at * 11 (M.D. Fla. Nov. 1, 2012). The Local Rules require any objection to:

> state with specificity all grounds upon which the objecting party relies. Any ground not stated in an objection within the time provided by the Federal Rules of Civil Procedure, or any extensions thereof, shall be deemed waived.

Local Rule 34.1(c)(1).

In addition to requiring that the objection be specific, "Rule 34 states the responding party must *either* state that the production will be permitted as requested *or* object and offer the reasons for the objection." *Leisure Hospitality, Inc. v. Hunt Props., Inc.*, 2010 U.S. Dist. LEXIS 93680 at *9 (N.D. Okla. Sept. 8, 2010) (citing Fed. R. Civ. P. 34(b)(2)(B)). Rule 34 makes no provision for producing only "subject to and without waiving objections." *Id.* at *10. "Such an objection and answer preserves nothing and wastes the time and resources of the parties and the

court." *Martin v. Zale Delaware, Inc.*, 2008 U.S. Dist. LEXIS 105215 at *4. "[T]his practice leaves the requesting party uncertain as to whether the opposing party has fully answered its request." *Id.* Thus, "[a] party may object to some or all of the requested discovery, but it must be clear whether the responding party is objecting or not and, if objecting, to what part of the request and on what specific grounds." *Leisure Hospitality*, 2010 U.S. Dist. LEXIS 93680 at *10 (citing generally 8B Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, FEDERAL PRACTICE AND PROCEDURE § 2213 (3d ed. 2010)).

Ferring's responses clearly violate the Federal and Local Rules, and applicable case law. Ferring has imposed blanket, boilerplate objections to nearly every discovery request without specifying how they apply to the requested information. It adds additional objections based on claims of overbreadth or undue burdensomeness, without specifying how the request is either overly broad or unduly burdensome, or what portions of searches it would employ. Ferring asserts that each request is not relevant and not calculated to lead to discoverable evidence without explaining why that is so or identifying the portion the objection of the request to which they apply. None of these objections is valid.

Similarly, Ferring's "subject to" responses do not actually state whether it will produce any particular categories of documents that are responsive to any of the requests at all. Ferring's rote responses suggest only that Ferring will produce whatever documents Ferring, in its own judgment, deems relevant, not subject to the boilerplate objections, and "representative," all without ever saying what categories of documents Ferring will and will not produce. Compounding this problem, Ferring has not timely responded to the letter detailing deficiencies or the meet and confer requests. *See* L.R. 37.1(a) (authorizing automatic allowance of motion).

Imposing general and boilerplate objections, then agreeing to produce some undefined

documents subject to those objections, then further restricting the production to what Ferring believes are "representative" and "relevant" documents is contrary to Federal Rule of Civil Procedure 34(b)(2) and L.R. 33.1, 34.1 and 37.1. Ferring's objections should be stricken, and Ferring's amended responses limited to privilege objections without subjective "relevancy" limitations or a qualifier that only "representative" documents will be produced.

## II.    Ferring Should Be Ordered to Amend its Discovery Responses to Remove Confidentiality Objections Given That a Confidentiality Order Has Been in Place for More than Five Months.

In both its responses to document requests and interrogatories, Ferring included objections based on the need for a confidentiality order. These responses were served before the Court entered a protective order addressing both sides' confidentiality concerns.

On April 6, 2015, however, the Court entered a protective order. More than five months since that order was put in place and Ferring has never amended its responses to provide the requested information. Ferring has provided no excuse for its failure to do so, and there is none. Over a month ago, during the parties' August 5 and 6 meet-and-confer calls, Ferring suggested it would provide amended responses that, among other things, removed the confidentiality objections no later than September 8, 2015. It failed to do so. Without an appropriate Order, Ferring would simply delay discovery further.

## III.   Ferring Should Be Compelled To Search For Documents From All Prepopik Salespeople, Not Just Management Level and a Select Few Salespeople

As explained above, this case is about sales and marketing practices in the pharmaceutical industry. As part of its sales and marketing programs, Ferring uses front line sales representatives who interact directly with the customers to promote and sell is product. As described by a Ferring employee, Melissa Wilmer, in a declaration Ferring has filed:

> 3. As part of my duties as a sales representative, I visit hospitals and the offices of gastroenterologist to promote and discuss Ferring's Prepopik product with healthcare professionals.
> 4. My discussions with the healthcare professionals, such as physicians, nurses, nurse practitioners, and schedulers occur in different forms, such as more formal lunch presentations and less formal office conversations.
> 5. I discuss the Prepopik product with the nurses, nurse practitioners and schedulers because these individuals often influence the physician's prescribing behavior.
> 6. Since at least last summer, I have been approached by healthcare professionals of different offices to discuss the Canadian Adverse Newsletter and the representations made by the Suprep sales representatives. …

(Doc. 81 at ¶¶ 3-6.) Ferring knows salespeople's general activities make them witnesses likely to possess relevant information, not only as to Ferring's sales practices, but also in connection with information about Braintree. Given the nature of this market, it also appears sales representatives collect information. In fact, Ms. Wilmer testified she received documents from doctors supposedly distributed by Braintree employees. (*See* Doc. 81 at ¶¶ 13 & 15.)

Ferring has, however, recently disclosed that in responding to discovery it had not searched documents in the possession of most of its front line sales representatives, except for a few selectively identified by it during this case. (Pollack Decl. ¶ 18.) Instead, Ferring focused its search on sales managers and home office personnel. (*Id.*) When pressed for the reasons behind this limited custodian selection, Ferring's counsel explained that it was based on the assumption that Lanham Act violations can be based only on general practices, not isolated sales incidents, making management-level custodians the only relevant custodians.[2] (*Id.* ¶ 19.) Yet even Ferring relied in earlier motion practice on salespeople as the source of information concerning alleged general practices.

Ferring's reasoning is fundamentally flawed. There is no basis to assume that documents

---

[2] Braintree made no such artificial limitation and instead searched for documents in the possession of its *entire* sales force.

reflective of general sales practices *among sales representatives* will necessarily be in the possession of only their managers. A source of what sales representatives are actually doing is obviously the sales representatives themselves. Sales representatives might also avoid copying certain managers in written communications to avoid creating an "electronic trail," and instead decide to speak to their managers on the phone or in person rather than forwarding information electronically. Also, managers' instructions might appear other than in managers' emails. The representatives' actual conduct may well be important evidence of corporate practice. In other words, one can envision a multitude of plausible scenarios that undermine Ferring's reasoning.

In a case about sales practices, this unilateral failure by Ferring to search sales representatives' electronic documents appears indefensible. Ferring has run only limited analytics on such salespeople's mailboxes, which generated hits (before de-duplication) of about a thousand each of alternative laxatives that could supplement Prepopik and appear in the salespeople's emails. (Pollack Decl. ¶ 30.) These hits relate directly to superiority claims at issue, as well as other claims and defenses. A full search should be done using all of Ferring's salespeople who have sold Prepopik.

**IV.    If Ferring Seeks to Use Predictive Coding, it Must Be Transparent in its Methodology and Provide Search Analytics That Reveal the Extent to Which Key Terms Appear in Documents That Its Protocol Has Deemed Non-Responsive.**

After making its productions, Ferring disclosed it did not use search terms to identify potentially responsive documents, but rather used predictive coding. As explained by one court,

> computer-assisted coding involves a senior partner (or [small] team) who review and code a "seed set" of documents. The computer identifies properties of those documents that it uses to code other documents. As the senior reviewer continues to code more sample documents, the computer predicts the reviewer's coding. (Or, the computer codes some documents and asks the senior reviewer for feedback.)

*Da Silva Moore v. Publicis Groupe*, 287 F.R.D. 182, 184 (S.D.N.Y. 2012).

When Braintree learned that Ferring had foregone search terms in favor of predictive coding on a wholesale basis, Braintree requested an explanation of Ferring's predictive-coding protocol. One judge who has authored several opinions on the subject "highly recommends that counsel … be willing to at least discuss, if not agree to, … transparency in the computer-assisted review process." *Id.* at 192. It has been willing to discuss only the name of its software and how the process worked, without revealing the substantive input that was provided to develop the predictive protocol. More troubling, Ferring has refused to provide Braintree with the "seed" documents that it manually reviewed and coded as responsive or non-responsive for purposes of educating the protocol. Thus, Braintree lacks sufficient information about how Ferring taught its predictive-coding protocol to identify responsive documents.

In an effort to narrow this dispute, Braintree suggested running keyword searches on the documents that were not selected for production by Ferring's protocol, which would provide at least some information as to the reliability of Ferring's approach. In a final meet and confer call, on September 11, 2015, Braintree learned that Ferring finally ran the terms, but Ferring provided analytics only for hits against the salespeople's mailboxes that had not previously been included in the predictive-coding process. (*See* Pollack Decl. ¶ 30.) In other words, these test hits offered absolutely no insight into the reliability of Ferring's predictive-coding methodology.

To mitigate the effects of Ferring's undisclosed methods for seeding predictive-coding protocol, and to ensure promptness and reliability in Ferring's electronic discovery production, Ferring should be ordered to provide prompt search analytics, including hit reports for all search terms Braintree proposes against the universe of electronic materials that include, but are not

limited to, mailboxes of pertinent Ferring salespeople and then the parties shall confer in good faith to modify such terms if necessary to avoid an unduly burdensome manual review of hits.

**V.      Ferring Should Be Ordered to Produce Emails Immediately**

More than a year after having been served with documents request, Ferring has yet to produce a single email. During the final meet and confer call on September 11, 2015, Ferring's counsel stated that some volume of emails were nearly ready but did not know the number or when they would produce them. (*See* Pollack Decl. ¶ 34.) There is simply no excuse for that position a year late.

The exchange of documents was understandably delayed due to the need for an appropriate protective order. As of April 6, 2015, however, a confidentiality order has been in place. Since then, Braintree repeatedly asked Ferring to make the mutual exchange of documents. Ferring first delayed, asking for more time, ignoring deadlines, or providing other excuses why Braintree had to wait. On July 11, 2015, after months of delay, Ferring finally produced an initial wave of documents. On July 30. 2015, Ferring produced a second wave of documents. Upon review, Braintree discovered that both of Ferring's productions omitted emails (without telling Braintree that it was doing so). After Braintree's counsel discovered the omission, Ferring's counsel confirmed incredibly that it had produced <u>no</u> emails. Ferring's counsel has committed to producing emails, but has refused to provide a timeline for doing so.

Ferring should be compelled to complete its email production immediately, particularly given the limited time period in which to take depositions and complete expert discovery.

**VI.      Ferring Should Be Ordered Respond To Discovery Related To Ferring's Possession And Use Of Braintree's Marketing And Business Information, Recruitment of Former Braintree Employees, and Ferring's Off-Label Marketing Practices.**

Ferring has taken a very narrow view of relevancy when it comes to Braintree's requests.

15

**A.** **Information concerning Ferring's improper acquisition and use of internal Braintree training materials is relevant to both Braintree's defenses and to Braintree's claims based on Ferring's false superiority claims.**

Ferring has refused to produce any discovery in connection with its possession of Braintree's marketing materials. Despite having admitted to possessing internal Braintree training materials concerning Ferring's Prepopik product, and basing claims on what it supposedly learned from its competitor's materials, Ferring has refused to respond to discovery on the topic, arguing that it deems the subject irrelevant to this action because the District Judge ruled that the content on the particular pages that Ferring revealed it had obtained did not constitute trade secrets that would give rise to a theft of trade secrets claim.

Ferring has objected to Interrogatories 20-22 as follows:

> 20.    Describe how Ferring came to possess the Braintree training materials that Howard Dorfman sent to Robert Raleigh including in your answer who obtained the materials, from where, when, by what means, and the identities of all persons involved.
> 21.    Identify all other Braintree training materials that Ferring possesses or has possessed since January 1, 2009.
> 22.    Describe any investigation conducted or effort to obtain "further clarity" (as stated in Howard Dorfman's July 10, 2013 correspondence to Robert Raleigh) with respect to Ferring's obtaining or possessing the Braintree training materials that Howard Dorfman sent to Robert Raleigh, including in your answer the persons involved in the investigation or effort, what steps were taken and by whom, and any information learned in the investigation or effort.

> **RESPONSE:** On August 4, 2014, the Honorable Judge Gorton granting Ferring's motion to dismiss Braintree's Amended Counterclaim (Doc. 36) with respect to Count I, trade secret misappropriation based on Ferring's alleged receipt and use of Braintree's training materials. (Doc. 95, pp. 4, 33).

> Ferring objects to this Interrogatory as seeking information not relevant to a claim or defense of the parties, and not being reasonably calculated to lead to the discovery of admissible evidence. Ferring further objects to this Interrogatory as overly broad and unduly burdensome. Ferring further objects to this Interrogatory to the extent that it seeks documents or information protected by attorney-client privilege, work product doctrine, or other applicable privilege.

Similarly, Ferring objected to Braintree's' First Requests for Production Nos. 16 and 17:

16.    All documents and communications concerning the Braintree training materials that Howard Dorfman sent to Robert Raleigh, including without limitation documents and  communications concerning any investigation or efforts to obtain additional information about  such materials.

17.    All documents and communications concerning any Braintree training materials or  any othe of Braintree's internal materials that Ferring  possesses or has possessed since January 1, 2009.

**RESPONSE:** On August 4, 2014, the Honorable Judge Gorton granting Ferring's motion to dismiss Braintree's Amended Counterclaim (Doc. 36) with respect to Count I, trade secret  misappropriation based on Ferring's alleged receipt and use of Braintree's training materials.  (Doc. 95, pp. 4, 33).

Ferring objects to this Request as overly broad and unduly burdensome to the extent that it seeks "all" documents. Ferring further objects to this Request as seeking information not  relevant to a claim or defense of the parties, and not being reasonably calculated to lead to the discovery of admissible evidence.  Ferring further objects to this Request as not identifying the  information sought with reasonable particularity. Ferring further objects to this Request to the  extent that it seeks documents or information protected by attorney-client privilege, work product  doctrine, or other applicable privilege.

(Declaration of Barry S. Pollack Exs. 1 and 2.)

Ferring's objections to these requests fail to account for several ways in which the witnesses to acquisition of the training materials possess relevant information about pending claims and defenses. Braintree is entitled to know the sources from which Ferring obtained internal Braintree material and its internal reactions in order to prepare defenses to claims Ferring has based in part of those materials. Also, Ferring's misconduct is relevant. Ferring seeks equitable relief in this action, and Braintree has asserted affirmative defenses, including unclean hands. Ferring's resort to conversion of Braintree's property, including confidential training materials as a means of supposedly combating Braintree's sales efforts – whether or not such materials rise to the level of trade secrets – informs an unclean hands defense that Braintree has raised and is entitled to invoke. In addition, Braintree has claimed that Ferring falsely promoted

its Prepopik product as superior. Documents reflecting Ferring's reaction to Braintree's training materials would likely bear on Ferring's claims that its product is superior.

In sum, Ferring brought this action and should not be allowed to hide the sources of information on which it has relied and its internal reactions to relevant competitive information.

**B.** **Ferring's campaign to hire Braintree sales personnel upon the initiation of the litigation is relevant to Braintree's equitable defenses and claims based on Ferring's false superiority advertisements.**

Since around the time a dispute arose between Ferring and Braintree, Ferring has engaged in a campaign to hire many of Braintree's sales personnel. This practice has included (1) the hiring of a sales manager, Mark Coates, who in turn appears to have recruited others who worked for him at Braintree, whom Ferring placed in a role designed in part to attract "key customers" of Braintree while using information known to Coates by virtue of his role with Braintree, and who Ferring eventually terminated; (2) the offering of positions to a Braintree sales representative without even an interview or any Ferring manager meeting the candidate; and (3) the attempt to place a former Braintree representative on a "representative advisory board" for the purpose of revealing to colleagues what she knew about Braintree's practices.

Ferring has objected to Braintree's' Second Request for Production Nos. 1-7 & 9, which seek information about this campaign, claiming that the request seek irrelevant or otherwise protected information:

> 1.     All documents and communications concerning or involving Mark A. Coates prior to his start date at Ferring.
> 2.     All documents and communications concerning or involving Mark A. Coates and  concerning Braintree or Suprep subsequent to his start date at Ferring.
> 4.     All documents and communications concerning Ferring's termination of Mark A.  Coates's employment.
> 5.     All documents and communications concerning any access by any Ferring  employee or agent, whether current or former, to Braintree's computer system, including without  limitation remote logins to Braintree's computer system or the viewing of business information  maintained on Braintree's computer system.

6. All documents and communications concerning or involving Teresa Cole, Courtney Beard, TJ Murphy, David Billeter, Meredith Middleton, Jennifer Proctor, Ashly Haugland, or Brittany Pace prior to his or her start date at Ferring.

7. All documents and communications concerning or involving Teresa Cole, Courtney Beard, TJ Murphy, David Billeter, Meredith Middleton, Jennifer Proctor, Ashly Haugland, or Brittany Pace and concerning Braintree or Suprep subsequent to his or her start date at Ferring.

9. All documents and communications concerning Ferring's efforts to recruit any Braintree employee(s), whether current or former.

**RESPONSE (1- 2, 4-7 and 9):** Ferring objects to this Request as seeking information not relevant to a claim or defense of the parties, and not being reasonably calculated to lead to the discovery of admissible evidence. Ferring further objects to this Request as overly broad and unduly burdensome to the extent that it seeks "all" documents. Ferring further objects to this Request to the extent that it seeks documents or information protected by attorney-client privilege, work product doctrine, or other applicable privilege.

3. All documents and communications concerning the creation or roles and responsibilities of the Director of Key Customer Development position.

**RESPONSE:** Ferring objects to this Request as seeking information not relevant to a claim or defense of the parties, and not being reasonably calculated to lead to the discovery of admissible evidence. Ferring further objects to this Request as being in vague with respect to its use of the term(s) "Director of Key Customer Development". Ferring further objects to this Request as overly broad and unduly burdensome to the extent that it seeks "all" documents. Ferring further objects to this Request to the extent that it seeks documents or information protected by attorney-client privilege, work product doctrine, or other applicable privilege.

(Declaration of Barry S. Pollack Ex. 3.)

These topics are relevant to key competitive marketing issues, credibility issues, Braintree's unclean hands defense and Ferring's resort to Braintree's salespeople despite Ferring's contention that they have behaved improperly. Based on timing, Ferring's aggressive recruitment campaign appears designed to gain a litigation advantage by neutralizing or influencing known witnesses. Coates was among the highest level proponents within Braintree for selling Suprep against Prepopik based on the products' comparative efficacies. By hiring Coates and others away as this litigation began and progressed, Ferring put itself in a position to influence Coates's and

other's testimony concerning the companies' sales practices and market perception. Braintree is thus entitled to discovery of Ferring's post-litigation campaign to recruit Braintree employees.

## CONCLUSION

Based on the foregoing, Braintree respectfully requests that the Court grant its motion to compel and issue an Order requiring as follows:

1. Ferring shall provide amended written discovery responses limiting objections to claims of privilege and without limitations based on its subjective "relevance" determinations and without limiting the production to its subjective view of "representative" documents. Anything that is withheld categorically shall be specified for each request in detail making clear why such a category of documents that are sought through the request are not being produced;

2. Ferring shall search for documents in the possession of all salespeople involved in the sale of Prepopik, not just select managers and home office personnel;

3. Ferring shall produce forthwith all responsive emails that it has already identified;

4. To mitigate the effects of Ferring's undisclosed methods for seeding predictive-coding protocol, Ferring shall promptly provide search analytics including hit reports for all search terms Braintree suggests against the universe of electronic materials that include mailboxes of pertinent Ferring salespeople, and then the parties shall confer in good faith to modify such terms if necessary to avoid an unduly burdensome manual review of hits; and

5. Ferring shall produce responsive documents concerning Braintree's marketing and business information in its possession (other than items produced by Braintree in this case), Ferring's recruitment and hiring of Braintree's former employees, and Ferring's off-label marketing practices.

Dated: September 11, 2015       Respectfully submitted,

/s/ Barry S. Pollack
Barry S. Pollack (BBO#642064)
Joshua L. Solomon (BBO#657761)
Eric M. Sommers (BBO #649611)
Phillip Rakhunov (BBO#663746)
POLLACK SOLOMON DUFFY LLP
133 Federal Street, Suite 902
Boston, MA 02110
617-439-9800 (Tel)
617-960-0490 (Fax)

## Certificate of Service

The undersigned certifies that this document, filed through the ECF system, will be
electronically served on counsel who are registered users of ECF on September 11, 2015.

/s/ Barry S. Pollack
